Max P. Lash v. Commissioner.
Lash v. Commissioner
Docket No. 48408.
United States Tax Court
T.C. Memo 1956-87; 1956 Tax Ct. Memo LEXIS 209; 15 T.C.M. (CCH) 453; T.C.M. (RIA) 56087; April 16, 1956
*209 1. Petitioner was the majority stockholder and an officer in Bristol Fabrics, Inc. He dominated its affairs. His wife and a daughter, who was a minor, owned the remaining shares. During 1945, the corporation made a wide variety of payments on behalf of petitioner. Held, such payments constituted taxable income to him. 2. Petitioner was in fact a partner in an enterprise known as Plastoplex Company, and an effort to substitute his wife as a partner in his stead was a sham. Held, the distributive income of Plastoplex allocated to his wife was correctly charged to petitioner by the Commissioner. 3. Held, petitioner was not in fact a partner in Analite Fabrics Company, and therefore the Commissioner erred in allocating a portion of its income to him. 4. Held, petitioner did not receive an item of income in the amount of $9,000 as determined by the Commissioner. 5. Held, part of the deficiency was due to fraud with intent to evade tax. George B. Lourie, Esq., 151 Devonshire Street, Boston, Mass., and Arnold R. Cutler, Esq., for the petitioner. Jack H. Calechman, Esq., and Burton L. Williams, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion
*210 RAUM, Judge: The Commissioner determined a deficiency in income tax in the amount of $55,148.95 for the calendar year 1945 and an addition for fraud in the amount of $27,574.48 pursuant to Section 293(b), Internal Revenue Code of 1939. The determination is based upon alleged unreported income which may be classified in four major categories: (i) payments computed by respondent to be in the aggregate amount of $33,789.48 made by Bristol Fabrics, Inc. to or on petitioner's behalf; (ii) partnership income in the amount of $24,412.44 representing petitioner's distributive share of income in Plastoplex Company if he is to be treated as a partner therein; (iii) partnership income in the amount of $1,736.36 representing petitioner's distributive share of partnership income in Analite Fabrics Company if he is to be treated as a partner therein; and (iv) income in the amount of $9,000 from an undisclosed source. A stipulation of facts filed by the parties together with any other facts stipulated during the course of the trial are incorporated herein by reference as part of our findings. I. Bristol Petitioner is an individual residing at 8 Penniman Road, Brookline, Massachusetts. At *211 all times relevant to this proceeding he was president and director of Bristol Fabrics, Inc. (hereinafter referred to as "Bristol"), and owned 101 out of the 200 shares of outstanding common stock. His wife, Bernice R. Lash, owned 39 shares, and his daughter, Patricia Lash, a minor, owned the remaining 60 shares. Bristol was in the business of obtaining and selling fabrics used in the manufacture of shoes. Its place of business was in Boston, Massachusetts. Petitioner dominated its activities. Harry Miller, a bookkeeper, and Peter Kranz, who was employed as sales manager in June 1943, were significant figures in the enterprise, but were distinctly subordinate to petitioner and subject to his control. During the year 1945 Bristol made certain expenditures and payments in the aggregate amount of nearly $34,000, representing over 400 separate items, which the Commissioner has treated as dividend income to petitioner. There is no dispute that the payments in question were made. The principal issue is whether the payments were made to or on behalf of petitioner personally or whether they represent expenditures on behalf of Bristol. The Government contends that, except for certain items *212 conceded by stipulation, the payments were made to or on behalf of petitioner, either directly for his benefit or for the benefit of his immediate family, and must therefore be treated as the equivalent of corporate distributions to him. Cf. Lash v. United States, 221 Fed. (2d) 237, 239 (C.A. 1), certiorari denied, 350 U.S. 826. On the other hand, petitioner contends generally that, except for certain other items conceded by stipulation, such payments were made on behalf of the corporation and cannot be attributed to him. [1] The parties have referred to the payments made on petitioner's behalf as "personal" and those on behalf of the corporation as "business". We shall employ the same terminology. By paragraph 4 of the stipulation of facts the parties have agreed that some 47 of the items, in the aggregate amount of $1,043.98, are not includible in petitioner's net income since they are either corporate expenses or, if personal, are deductible by petitioner. By paragraph 5 of the stipulation the parties have agreed *213 that some 97 of the items in the aggregate amount of $1,510.46 [2] represent "personal" nondeductible expenses of petitioner. The remaining items were presented to us at the trial in separate groups or categories, and, for the purpose of convenience, without indicating whether we accept as accurate the labels placed upon these categories by petitioner, we shall consider the various items as they were presented to us in these groups, but not necessarily in the same order. Petitioner's brief now recognizes that in some of the categories, at least a portion of the expenditures should be considered "personal" and his brief and proposed findings make suggestions for allocations, presumably in accordance with the rule in Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2). Petitioner appeared as a witness at the trial. Although he was candid at times, we on the whole had little confidence *214 in his testimony or in that of his wife. They appeared in general to be all too willing to bend the facts to suit what they conceived to be their best interests, and, of necessity, we took into account our appraisal of their credibility in making our findings. (a) Telephone Bills. During 1945 Bristol paid each month's telephone bill for the telephone in petitioner's home. In addition to the basic telephone charge there were generally many additional local calls, a number of long distance calls, and also from time to time some telegrams. The total amount of the telephone bills (thirteen in all) so paid by Bristol in 1945 was $375.24. Petitioner now concedes that a part of the amount involved, including some of the long distance calls, must be treated as personal. He did not, however, identify a single call which was for non-personal purposes, beyond his general and vague statement of such ultimate fact. He attempted to explain the heavy use of his home telephone by stating that he was a late riser. We are not convinced by his testimony that there was any such extensive business use of his personal telephone. However, we think that a small part of the telephone bills may have reflected *215 use on behalf of Bristol, and, relying upon the Cohan rule it is our best judgment and we so find as a fact that five per cent of the telephone bills represented use on behalf of Bristol and that the remaining 95 per cent was personal. (b) Automobile Expenses. Bristol owned two automobiles during 1945, which were garaged quite near petitioner's home. In that year Bristol spent a total of $965.34 [3] (reflected in some 58 separate items) on the vehicles for garage rent, insurance and other expenses. Petitioner regularly drove both of the foregoing automobiles. He used them to commute to and from work (a personal and not a business use), while on vacation and on pleasure driving generally while at his home in Brookline, including travel to a country club and a beach club. His wife also drove the cars on personal errands. Neither petitioner nor his wife owned an automobile personally. Petitioner concedes that a portion *216 of the use by him of both cars was for personal and family reasons rather than for purposes connected with the business of Bristol. He estimated that of amounts spent by Bristol in 1945 in connection with the automobiles 25 per cent should be allocated to such personal use. We agree that there should be an allocation, but are of the opinion that petitioner has been far too modest in estimating the share of the use of both automobiles properly allocable to personal use. Petitioner testified that in addition to himself, two employees of Bristol, one Mason and one Webber, used the cars on company business. The evidence is not as clear and free from doubt as is desirable. However, it appears that Webber owned an automobile, which he used in connection with his work on behalf of Bristol. Furthermore, Webber did not drive, but was chauffeured by Mason, who drove Webber's car. No one else was mentioned as driving either of the two cars on company business. We are of the opinion that some use of the vehicles was made by petitioner on behalf of Bristol as well as for himself personally. Our best estimate is that 80 per cent of the combined use of the vehicles in 1945 was for the personal *217 use and enjoyment of petitioner, and we so find as a fact. (c) Restaurant Bills. This category consists of six items in the aggregate amount of $112.42 and represents, in general, restaurant bills paid by Bristol in 1945 in and around Boston, to the Copley Plaza, the Hotel Preston, Shangri-La, and the Hotel Statler. The testimony that these were business expenses of Bristol was exceedingly weak, although some part thereof may have been of a business character. It is our best judgment on the evidence that 80 per cent of the expenditures in this category were personal to petitioner and we so find as a fact. (d) Theater Tickets. During 1945 Bristol paid eleven bills in the aggregate amount of $279.35 for theater tickets to two ticket brokers identified as Herrick's and McBride's. Respondent has determined that such payment was made for the personal benefit of petitioner, and has accordingly included it in petitioner's income. Petitioner conceded that he and his wife sometimes used such theater tickets personally, and we note that in many instances only two tickets were purchased at a time in Boston near where the Lashes lived. We are satified that such purchases, as well as the *218 purchase of a single ticket in New York, all in the amount of $110.10, were made solely for the personal benefit of petitioner. Our best judgment as to the remaining $169.25 is that 50 per cent thereof represents expenditures by Bristol for petitioner's personal benefit, and we so find as a fact. (e) Shoe Purchases. During 1945 Mrs. Lash purchased many pairs of shoes and related items, Bristol paying the bills therefor. The total amount involved, representing 24 items, is $480.14. [4] Such purchases were made at a number of retail stores, including B. Altman & Co., Bergdorf Goodman, Delmar, Gimbel Brothers, Milgrim, Saks 5th Avenue, and Wilbar's. We are satisfied from the entire record that in fact some of the shoe purchases were not personal. However, the amount in question includes amounts paid for sandals, hose and handbags, and we are not convinced that any of such purchases were other than for personal use. In our best judgment $300 of the above total of $480.14 represents an amount paid by Bristol for expenses personal to petitioner, and we so find as a fact. *219 (f) Hotel Bills. Bristol paid a substantial amount for hotel bills, including miscellaneous charges at various hotels, during 1945. Respondent has determined that such amount was in fact paid for petitioner's personal use and enjoyment and hence constituted income to him. The hotel bills (22 in all) fall into five groups, as follows: Place
Amount
Maine
$1,038.88
Florida
2,282.40
Washington, D.C.
96.72
Harrisburg
10.76
New York
1,050.40 [5]
$4,479.16
In our view of the evidence the Maine bills in the amount of $1,038.88 were entirely personal, despite petitioner's contention that they represented mixed business and pleasure. They were incurred in a resort setting, during the summer vacation period. Petitioner's older daughter was spending the summer in a children's camp nearby. These hotel bills included charges for golf, beauty parlor services, beverages, massage, and various other charges that were obviously personal in nature. Petitioner's testimony that he was conducting business with nearby shoe manufacturers was not convincing. *220 He has failed to satisfy us that any part of such bills should be treated as anything other than personal. The Florida bills, totalling $2,282.40, fall within the same category. These bills were paid to Roney Plaza Hotel and the Sea Isle in Miami Beach and to the Whitehall in Palm Beach, and included not only charges for room and meals for Mr. and Mrs. Lash, but also a variety of other items such as radio, bar, solarium, and cabana club. Petitioner admittedly had no intention of doing business when he left for Florida. In fact he concedes these bills to be "mainly" personal, and admits in substance that if he did meet any business associates there, it was accidental. His attempts to show some connection with business are vague and unconvincing. We find the entire Florida expense to be personal. The bill relating to Washington, D.C. was in the amount of $96.72. As in the case of the Maine and Florida trips, petitioner was accompanied by Mrs. Lash. Petitioner claimed that this item represents an expense in connection with what he referred to without further explanation or proof as "pricing regulations." We cannot find from this scanty statement that this item was in fact other than *221 as characterized by respondent. Petitioner has failed to carry his burden of proof with respect thereto. An item in the amount of $10.76 relates to a hotel bill incurred by Mrs. Lash in Harrisburg, Pennsylvania. Since no evidence was offered with respect thereto we must hold it to be personal. On the other hand, it is clear that the New York bills were at least partly incurred for purposes not personal to petitioner. A precise allocation is impossible, but we must do the best we can with such evidence as we have. Accordingly, we find that of the New York bills, in the amount of $1,050.40, 50 per cent did and the rest did not represent payments for the personal benefit of petitioner. (g) Belmont Country Club. During 1945 petitioner was a member of the Belmont Country Club. Both he and his wife used its facilities regularly. Bristol paid membership fees and other miscellaneous costs, expenses and contributions related to the club, including the cost of golf lessons for petitioner's wife, all in the total amount of $1,853.06. Petitioner testified that among the other members of the club were persons with whom Bristol did business, but failed to name one such person. His claim *222 that he entertained certain persons there for the benefit of Bristol in 1945 is very weakly supported by the record, and, taking into account our view as to petitioner's credibility, we cannot say that he has carried his burden of proving that respondent erred in increasing his taxable income by the foregoing amount. (h) Flowers. Bristol paid nine bills in the aggregate amount of $203.98 during the calendar year 1945 for flowers. An examination of the bills discloses that these items were plainly personal, and petitioner in his brief now waives his contentions with respect thereto. (i) Lash checks. During 1945, petitioner drew a number of checks upon Bristol in the aggregate amount of $4,402.47 which he cashed, and he also received from Bristol $658.22 which represented the proceeds of two petty cash vouchers. Included among the checks were five checks cashed at Florida hotels in the aggregate amount of $2,085 while petitioner was on vacation; they did not represent business expenses of Bristol, and he received the proceeds for his personal uses. Of the remaining checks, eleven in number, in the aggregate amount of $2,317.47, we are satisfied that 75 per cent is allocable to *223 the business of Bristol and that the remaining 25 per cent represents monies received by petitioner for his personal uses. The two petty cash vouchers were in the amounts of $481 and $177.22. The $481 voucher was for petitioner's personal benefit to the extent of 50 per cent thereof; the other voucher, for $177.22, was entirely personal to petitioner. (j) Gifts. This category of expenditures consists of 42 items embracing a large number and wide variety of purchases, generally of small individual value, in the aggregate amount of $1,234.54. [6] Petitioner contends that these expenditures were made for gifts to persons having some relationship to the business of Bristol. The testimony was generally vague and uncertain, often consisting only of petitioner's general statement that this or that item was for corporate rather than personal purposes. However, we are satisfied that a number of these gifts were made on behalf of Bristol, and, using our best judgment on the evidence, we find as a fact that 50 per cent of the amount at issue in this category was expended for the benefit of Bristol and the remainder for the personal benefit of petitioner. *224 (k) Kranz Vouchers. Peter Kranz (hereinafter called "Kranz") was a buyer and seller for Bristol. He was first employed in June of 1943 at a fixed salary. He had extensive experience in the textile business, and his value to Bristol soon became apparent. He received a substantial adjustment in compensation approximately one month after his employment commenced, with the result that he was thereafter entitled to a commission on sales in addition to a salary. He left Bristol in October or November of 1945. While in Bristol's employ Kranz travelled to New York almost every week, in the course of his employment. During 1945, and until he terminated his relations with Bristol, he made 39 such trips. Kranz normally remained in New York for a period of two days each trip. On four occasions he stayed three days. He was paid in advance for his expenses. He received $65 for a two-day trip and $80 for one lasting three days. In each instance he knew in advance whether his stay would be two or three days, and was paid accordingly before leaving for New York. He kept no complete record of expenses, and received during 1945 no payments in respect of travelling expenses and other expenses while *225 away from Boston on business of Bristol, other than the above. The amounts so received by him in 1945, in the aggregate of $2,595, were approximately equivalent to his actual expenses. During 1945 Kranz did not sign a petty cash voucher for the amount received each time he was given funds as described above. Instead, he would, at various times during the year, sign a number of blank vouchers. He never again saw any of such vouchers, except in connection with the instant proceeding. The vouchers were subsequently filled in by Harry Miller (hereinafter called "Miller"), Bristol's bookkeeper and office manager, in amounts substantially in excess of payments actually made to Kranz. The aggregate amount of the vouchers as thus subsequently filled in by Miller was $6,261.56, and was actually paid out by Bristol. Miller was subject to petitioner's control and is still employed by Bristol. We are fully satisfied that petitioner, who dominated Bristol's activities, received the difference between the amounts shown on the vouchers and the amounts actually paid to Kranz. Certainly he has not carried his burden of proof as to this matter, apart from the $2,595 shown to have been paid to Kranz. *226 There has been here a conflict in several important respects between the testimony of petitioner and the books of Bristol on the one hand, and the testimony of Kranz on the other. In most of such instances we have tended to believe Kranz rather than petitioner, or the books of Bristol. We have concluded, having observed both men and heard their respective testimony, that the testimony of Kranz is more worthy of belief than that of petitioner. The salesmen's expense records of Bristol were prepared by persons under petitioner's control, and we have little faith in the accuracy of the figures contained therein. We find as a fact that petitioner received the difference between the $6,261.56 reflected in the Kranz vouchers and the $2,595 actually paid to Kranz. (1) Fictitious Bonus to Harry Miller. Harry Miller was in the employ of Bristol during 1945 as bookkeeper and office manager. His employment had commenced in 1937 or 1938, and at the date of this hearing he was still so employed. In 1943, 1944 and 1945, Miller received Christmas bonuses from Bristol in the respective amounts of $1,200, $1,000 and $500, which he promptly deposited in various bank accounts maintained by *227 him. His regular annual salary in 1945 was approximately $7,000. On May 2, 1944, Miller received a check from Bristol in the amount of $5,600, purportedly as a bonus. This check was not deposited, but was instead cashed at the United States Trust Co., although Miller did not maintain an account there at that time. Thereafter, Miller deposited the sum of $2,600 in an account in another bank. There is no evidence in the record respecting the treatment by Miller of the rest of the proceeds of that check. On June 8, 1945, Miller ostensibly received a bonus in the amount of $8,750 from Bristol. He was given a check for $7,000, representing the amount of the alleged bonus less withholding, which he did not deposit, but cashed at the United States Trust Co. As in the previous year, he did not have an account there. He first opened an account with that institution on November 26, 1945, months after cashing this latter check. No substantial deposit was made by Miller during any period shortly following the cashing of the $7,000 check. There is no satisfactory evidence showing that Miller used or retained the proceeds for himself. Petitioner accompanied Miller to the United States Trust *228 Co. on both of the foregoing occasions. Each time, he entered his safe deposit box in the same bank, within minutes after Miller cashed the check. Visits by petitioner to his safe deposit box were infrequent during 1944 and 1945. No other employee of Bristol received a bonus in 1944 or 1945 at or about the time of the payment to Miller of the two large alleged bonus checks. Respondent's position in substance is that the amount of $8,750 allegedly disbursed by Bristol in 1945 as a bonus to Miller was in fact a payment to petitioner; that Miller received and cashed the check under the direction and control of petitioner and, according to prearrangement, paid petitioner the proceeds thereof. Respondent's determination that the Miller bonus was in fact a payment by Bristol to or for the benefit of petitioner carries with it (apart from the question of fraud) a presumption of correctness. Furthermore, while there has been no testimony directly supporting respondent's position here, there is strong circumstantial evidence in support of it. Miller's consistent practice of depositing the relatively small year-end bonuses makes strange indeed his conduct with respect to the comparatively *229 lavish amounts allegedly given him in mid-year of 1944 and 1945. We have been shown no satisfactory reason as to the occasion for such bonuses, or in what manner the proceeds of the two large checks were spent or increased Miller's net worth, with the exception of $2,600 in 1944. The amount of the 1945 bonus, $8,750, was in excess of Miller's regular annual salary. We are not convinced by petitioner's recital of extraordinary facts explaining such largess. For example, petitioner's testimony suggesting that a bonus of such magnitude was given because of heavy medical expenses incurred by Miller on behalf of his wife strains our credulity when, upon examining Miller's income tax return for 1945, which is in evidence, we find no medical deduction claimed by Miller. The fact that Bristol's fiscal year ends on November 30 further militates strongly against the giving of bonuses in May and June, particularly in so generous an amount. It is unusual, to say the least, that Miller should then cash such a check in a bank with which he had at the time no connection, accompanied by petitioner. The explanation offered by petitioner as to why he accompanied Miller, and entered his safe deposit *230 box so soon after Miller cashed the purported bonus check, is far from satisfactory and convincing. Although the evidence is circumstantial it strongly supports the Commissioner's position. In any event, we are satisfied that petitioner has not carried his burden. We find that petitioner has failed to prove by credible evidence that he did not in fact receive for his own use and benefit the controverted bonus ascribed to Miller for 1945. Respondent's determination in this respect is sustained. (m) Miscellaneous. Some items not apparently related to any of the foregoing groups still remain to be disposed of, in the total amount of $1,268.58. Petitioner at the trial presented these items as two separate groups, one denominated "Business expense - claimed in entirety", involving 18 items, in the aggregate amount of $1,146.33, and the other denominated "Miscellaneous", involving 5 items, in the aggregate amount of $122.25. We think that all items in both groups can be dealt with under one heading. The first item in the amount of $27 consists simply of a check of Bristol signed by petitioner on behalf of the corporation as drawer, and payable to "Lewis Purses". Petitioner claimed *231 that the amount thereof represented a purchase by one of Bristol's salesmen, but could furnish no further information with respect thereto. We are not convinced that respondent erred as to this item. The next five items consist of a number of charges for use of taxicab by petitioner and his wife, in the total amount of $27.50. We conclude from the record, in so far as it pertains thereto, that this amount was in fact paid for taxicab services personal to petitioner and his wife. The seventh item to be considered is the amount of $44.35 for glass table tops. We are satisfied that they were in fact purchased and used for office furniture at the office of Bristol, and no part thereof is includible in petitioner's taxable income. The eighth item, in the amount of $200, represents that part of the payment by Bristol of a painter's bill in the total amount of $600, which respondent claims to be properly allocable to work done at petitioner's home. Petitioner testified to the effect that, while some painting work was in fact done at his home at that time it did not exceed $50 in value. He further testified that he personally paid for such work at the time, independently of and in addition *232 to the payment of $600 by Bristol. The latter amount is claimed to have been entirely in respect of work done at Bristol's office. The painter testified, and his testimony, which we find credible, substantially supports the position taken by the respondent. The work done at petitioner's home consisted of painting of exterior sash, child's bedroom, and kitchen; the bedroom was painted more than once since the color selected by Mrs. Lash was found to be unsatisfactory. Of the total of $600 paid by Bristol, $200 represented work done at petitioner's home and must be attributed to him. The next six items in this group concern liquor purchased in the total amount of $588.25. We are convinced that some, but substantially less than all of such purchases were other than for petitioner's personal benefit. Petitioner, of course, bears the burden of proof on this as on all other issues, exclusive of fraud. His failure to present better evidence to aid us in our determination is a factor that must be taken into account. We deem it a significant fact in petitioner's favor that the heaviest volume of liquor purchases took place toward the end of the year, shortly before Christmas. Such purchases *233 may have been made for the purpose of making gifts to Bristol's customers. However, it is also quite possible that he may have made a number of personal gifts of liquor, unrelated to the business of Bristol. Using our best judgment in view of the scanty nature of the evidence before us, we find that 50 per cent of the above sum of $588.25 represents an amount paid by Bristol for the personal benefit of petitioner. The next item consists of a purchase of yard goods by Mrs. Lash at Saks 5th Avenue for $7.45. We are not convinced that this does not represent a personal expenditure. Accordingly, we sustain the respondent thereon. The next three items consist of jewelry purchases in the amount of $108, and an item in the amount of $143.78 for work performed at the building in which Bristol kept its office. Without going into the evidence in further detail, we find that no part of these amounts was expended for purposes personal to petitioner. The next item is rental for a safe deposit box, which was in petitioner's name. Both personal papers of petitioner and corporate papers of Bristol were kept there during 1945. Bristol paid the annual rental of $12. We find that one-half of that *234 amount, or $6, was paid for the personal use by petitioner of that box. Petitioner could not recall with any fair degree of certainty or conviction the nature of the remaining four items, totalling $110.25. We do not know what their true nature may be, or whether in fact they were personal or corporate in purpose. The evidence simply shows that they represented department store purchases of several small "petal rugs" and some cloth. On the record as it stands, we must hold that petitioner has failed to carry his burden of proof, and, accordingly sustain respondent's determination as to these items. [n] Earnings and profits. In attributing the foregoing items to petitioner, the Commissioner has described them in his determination as "constructive dividends" paid by Bristol. Petitioner now attempts to raise the question whether the corporation had sufficient earnings and profits to support distributions of taxable dividends in the amounts reflected in these items. We think the point is without merit. In the first place, apart from the issue of fraud, the burden of proof is upon the petitioner, and if the question is properly before us it is incumbent upon him to show the insufficiency *235 in corporate earnings and profits. This he has not done. To the contrary, the record contains evidence which strongly supports the conclusion that there were sufficient earnings and profits. Petitioner himself testified that Bristol had net income in the amount of $87,823.13 for its fiscal year ending November 30, 1945, and his own income tax return for 1945, which is before us, is persuasive evidence that such earnings were not otherwise paid out as dividends. We are fully satisfied, even for purposes of the fraud issue decided hereinafter, that Bristol had earnings and profits in an amount sufficient to cover the "constructive dividends" which the Commissioner attributed to petitioner, and we so find as a fact. Moreover, it would seem that the amounts expended by Bristol for petitioner's benefit would constitute income to him, regardless of whether it had "earnings and profits". The existence of corporate "earnings and profits" is significant only where the payment must be classified as a dividend in order to be taxable. In the instant situation it is questionable whether it was necessary for the Commissioner to describe these items as "constructive dividends". A diversion of corporate *236 funds by the dominant stockholder and officer of a corporation has been held to constitute income regardless of whether it may be classified as a dividend, and taxability to him therefore need not turn upon the existence of corporate earnings and profits. Such is the square holding of Davis v. United States, 226 Fed. (2d) 331 (C.A. 6), certiorari denied, - U.S. -. Accordingly, it probably was entirely unnecessary for the Commissioner to characterize these items as "constructive dividends". However, in view of our finding that there were sufficient corporate earnings and profits, the point need not be reached. II. Plastoplex The Commissioner determined that $24,412.44 of the 1945 distributive income of a partnership known as Plastoplex Company was chargeable to petitioner. Petitioner contends, on the other hand, that the income in question was attributable to his wife and that he had no partnership interest whatever in the enterprise. Elfskin Corporation, of Worcester, Massachusetts (hereinafter referred to as "Elfskin"), was one of Bristol's suppliers. Melvin Sawyer was its dominant stockholder and officer. In July of 1943 Sawyer and petitioner agreed to and did *237 form an equal partnership to deal in coated materials under the name of Plastoplex Company. All manufacturing, shipping and bookkeeping was the responsibility of Sayer, and he discharged that responsibility through the facilities and employees of Elfskin at its Worcester office which became the address of Plastoplex. Procurement of the uncoated fabrics and sales of the finished product were the responsibility of petitioner through the facilities of Bristol. The partnership agreement between petitioner and Sawyer was oral. At a considerably later time, which petitioner admits could have been "weeks or months" thereafter and which we think, upon the basis of other evidence, was probably toward the latter part of 1944, a written partnership agreement was executed with respect to the Plastoplex enterprise. The written agreement, however, was pre-dated July 12, 1943. It was signed by Kranz, Mrs. Lash, Elizabeth Sawyer, Josephine Abeles and Harold Levine, and purported to create a partnership between the signers called Plastoplex Company. Under this new agreement Kranz appeared as having a 10 per cent interest and Mrs. Lash a 40 per cent interest, thus accounting for the 50 per cent interest *238 originally held by petitioner. The other three persons named in the agreement as partners were denominated as having interests equalling in the aggregate 50 per cent, thus accounting for Sawyer's interest in the original partnership. The reason that petitioner permitted Kranz to have a 10 per cent interest was that Kranz was performing valuable services for Bristol and that the laws and regulations then in effect with respect to salary stabilization placed a ceiling upon the compensation which Bristol could pay Kranz. The 10 per cent interest purportedly given to Kranz was to provide Kranz with increased earnings in an effort to avoid the salary stabilization laws and regulations; Kranz paid nothing for his interest in Plastoplex, and when he terminated his employment with Bristol late in 1945 his interest in Plastoplex ceased. Mrs. Lash never performed any services for Plastoplex. The Government contends that the written agreement, at least as to Mrs. Lash's alleged interest, was a sham; that the real partnership originally created by petitioner and Sawyer continued, and that since the alleged new partnership was a sham as to Mrs. Lash, the partnership income ascribed to her must *239 be attributed to him instead. It does not here seek to charge petitioner with the income of the enterprise that was distributable to Kranz. Petitioner answers the Government's position in substance as follows: When petitioner returned to Boston from Worcester in July 1943 after his oral agreement with Sawyer, he promptly became aware of the disadvantage, tax-wise, in such a partnership, and accordingly took immediate steps to have that partnership superseded by a new partnership in which his wife and Kranz replaced him in the proposed enterprise and the three other persons similarly replaced Sawyer; thereupon, an oral partnership was entered into by the five persons in question; the original oral partnership between petitioner and Sawyer never did transact any business, but was promptly superseded by the new oral partnership; and the written pre-dated agreement, admittedly executed at some later unspecified time, merely recognized an oral partnership already in existence in which these five persons were partners. One of the difficulties with this theory is that we simply do not believe most of the alleged facts upon which it rests. We do not believe that there was any such oral *240 partnership agreement between Kranz, Mrs. Lash, and the three persons purportedly replacing Sawyer. The evidence, as we read it, taking into account certain indisputable facts and our view of the credibility of the witnesses, points strongly in the opposite direction. To us, it is all too clear that the original partnership between petitioner and Sawyer commenced operations; that it was only at some considerably later time, when the tax disadvantages of the arrangement became apparent, that an attempt was made retroactively to supersede the original partners; and that at least as to Mrs. Lash [7] the purported arrangement was just as much a sham thereafter as it was before. The original Plastoplex Company, with petitioner and Sawyer as partners, began operations as early as July 10, 1943, when it purchased merchandise in the amount of $1,369.80 from Western Felt Works. Between July 14 and July 20, 1943, it made seven other purchases of merchandise in the aggregate amount of $7,934.65. On July 23, 1943, Sawyer executed a signature card as a partner of Plastoplex when he opened a company checking account *241 in The Mechanics National Bank of Worcester. Also, on July 23, 1943, petitioner and Sawyer executed a document stating that they were partners doing business as Plastoplex Co., and giving authority to The Mechanics National Bank of Worcester to accept certain signatures to draw, sign, or endorse notes, drafts, checks, receipts, orders, bills of exchange, bills of lading, acceptances or other instruments in writing, necessary for transacting any business for the partnership with the bank. On July 29, 1943, the partnership was registered with the Town Clerk of Leicester, Massachusetts, pursuant to Massachusetts law, and petitioner and Sawyer were the only persons designated as partners on such registration. On August 10, 1943, an additional signature card for the Plastoplex account was delivered to The Mechanics National Bank of Worcester, which included petitioner's signature. The record contains evidence of various transactions entered into by Plastoplex prior to August 10, 1943, and we are completely satisfied that Plastoplex was an active, going concern with petitioner and Sawyer as the only partners. On July 23, 1943, Sawyer and petitioner made capital contributions of $5,000 *242 each to the enterprise. Although the books purport to reflect contributions of $4,000 by Mrs. Lash and $1,000 by Kranz on July 23, 1943, we have no confidence in those entries. Kranz in fact contributed nothing, and when Mrs. Lash was asked at the trial whether her supposed $4,000 contribution was based upon a gift or a loan from her husband she did not remember; only when shown a $4,000 check drawn by her in January 1945 to her husband did she conclude that it had been a loan. The evidence suggests to us that, since Plastoplex was plainly a partnership between petitioner and Sawyer on July 23, 1943, and at least for some considerable time thereafter, the entry purporting to show a $4,000 contribution by Mrs. Lash on July 23, 1943, was a false entry and that her January 1945 check to petitioner was merely part of the effort to round out the deception. Petitioner's $5,000 contribution to Plastoplex on July 23, 1943, was made to appear on the books as though Mrs. Lash and Kranz had contributed $4,000 and $1,000 respectively on that day. We conclude that it was petitioner, and not his wife, who was the real partner in Plastoplex, and we do not regard it as particularly significant in *243 the context of this case that he permitted his share of the earnings to be distributed to a natural object of his bounty, namely, his wife. Other evidence bearing upon the absence of bona fides of the second so-called partnership is the fact that the law firm which drafted the agreement dated July 12, 1943, submitted its bill for its services, in the amount of $15, on February 1, 1945. The bill was addressed to "Plastoplex Co. c/o Melvin Sawyer". Also, as late as September 6, 1945 and April 2, 1946, it was Sawyer who drew checks upon the partnership account, purportedly for distribution of partnership earnings. We find as a fact that the attempt to substitute Mrs. Lash as a partner in Plastoplex in place of petitioner was a sham, and that petitioner in truth and in fact remained a partner in Plastoplex after the pre-dated agreement of July 12, 1943. Accordingly, the distributive share of partnership income which was attributed to Mrs. Lash must be charged to petitioner. On this issue we sustain the Commissioner. Plainly, petitioner has not carried his burden of proof. III. Analite
On or about October 16, 1944, Analite Fabrics Co. was formed as a partnership. Kranz and Mrs. *244 Lash were designated as general partners, and one Louis Rosenberg, the father of Mrs. Lash, was made a limited partner, as trustee for a child of the Lashes. No other persons were named as partners. Analite's address was the same as that of Bristol, and the office facilities of the latter were utilized. Analite sold and distributed materials of a somewhat different type from those in which Bristol dealt. Aside from office details, Kranz performed substantially all the necessary services, consisting of buying and selling. Several salesmen sold for Analite on a commission basis under the supervision of Kranz. Petitioner was never authorized to nor did he sign checks for Analite. His name does not appear to have been connected in any manner with that of Analite at any time. The Commissioner's determination attributed to petitioner $1,736.36 of the 1945 distributive income of Analite allocable to Mrs. Lash and the trustee. The facts as to this partnership were different from those pertaining to Plastoplex, and we sustain petitioner as to this issue. The evidence discloses that Mrs. Lash borrowed $12,500 from the United States Trust Co. which was used for the capital contributions *245 to Analite made by her and the trustee. It is true that petitioner advised her and accompanied her to the bank at the time the loan was made, that her stock in Bristol which was put up as collateral for the loan had been given to her by petitioner, and that the bank might well have refused to make the loan to her but for its prior dealings with petitioner. However, the fact remains that he did not endorse the note and it was she alone who became liable on it. She used the proceeds of the loan on behalf of herself and the trustee in making a bona fide contribution to the capital of the enterprise. We conclude that petitioner may not be treated as a partner in Analite and that the Commissioner erred in charging him with a distributive share of the income therefrom. IV. Income from Undisclosed Source On July 9, 1945, a cashier's check in the amount of $4,500 was purchased from the United States Trust Co. On July 12, 1945, another such check in the same amount was similarly purchased. The proceeds of these checks were eventually used in part as repayment of an indebtedness of petitioner's brother, Allen A. Lash, to the United States Trust Co. The Commissioner determined that the *246 $9,000 used to purchase these checks represented income to petitioner from an undisclosed source. The record is shrouded in some confusion as to who purchased these checks. The scanty bank records introduced in connection with the acquisition of these checks contain the rather cryptic legend "Re: Max Lash", and the bank official who testified with respect to such records was unable to make a satisfactory explanation as to its meaning. Petitioner's brother had died prior to the trial, and petitioner denied having purchased these checks or having had in his possession at the dates in question funds sufficient to effect such purchases. Although there may be more to this item than meets the eye, we think that on the whole the evidence tips the scales in favor of petitioner on this issue, and we find, without strong conviction, that the $9,000 reflected in these two cashier's checks did not represent income to petitioner in 1945. V. Fraud Respondent has determined that a part of the deficiency was due to fraud with intent to evade tax and claims an addition to the tax of 50 per centum of the total amount of the deficiency in accordance with Section 293(b), Internal Revenue Code *247 of 1939. Respondent bears the burden of proving fraud by clear and convincing evidence. Cf. George M. Still, Inc., 19 T.C. 1072, 1077, affirmed, 218 Fed. (2d) 639 (C.A. 2); A. W. Mellon, 36 B.T.A. 977, 1054. We are satisfied that respondent has met that burden, and we find as a fact that part of the deficiency owing for 1945 was due to fraud with intent to evade tax. It was not incumbent upon respondent to show that the entire deficiency was based upon fraud. The statute requires only that "any part" of the deficiency be due to fraud, and fraud as to any part is sufficient to sustain the so-called penalty with respect to the entire deficiency. Russell C. Mauch, 35 B.T.A. 617, 625, affirmed, 113 Fed. (2d) 555 (C.A. 3); Ollie V. Kessler, 39 B.T.A. 646, 653-654. As to those items or issues that we decided against petitioner merely by reason of his failure to carry his burden of proof, it is plain that the record cannot sustain a finding that the Commissioner, in turn, has discharged his burden of proving fraud, and we do not rest our finding of fraud on any such items or issues. However, the record *248 is replete with items that clearly and convincingly establish fraud. For example, Bristol paid what were plainly personal expenses of petitioner at resort hotels in Maine and Florida; it paid his personal expenses at a country club and a beach club; it paid Bigelow Kennard Co. for engraving dies marked "Bernice" and "Penniman Road" and for matches marked "The Lashes", charging such expenditure to "Sales promotion"; it paid M. T. Bird Co. for baby announcements ten days after petitioner's daughter was born, charging the expenditure to "Office expense"; it paid a Boston newspaper for advertisements for female domestic help, charging the expenditure to "Sales promotion"; it paid for newspapers delivered to petitioner's residence, charging such expenditure to "Office expense"; it paid for repairing a roof at petitioner's residence, charging the expenditure to "Advertising"; it paid for repairs to a shower stall at petitioner's residence, charging the expenditure to "Advertising"; it paid for making slip covers for two wing chairs delivered to petitioner's residence, charging the expenditure to "Office expense"; it paid for certain plumbing repairs at petitioner's residence, charging the *249 expenditure to "Shipping expense"; it paid for repairing a screen door and installing window shades at petitioner's residence, charging the expenditure to "Shipping expense" and "Sales promotion", respectively; it paid for clearing snow and stopping leaks at petitioner's residence, charging the expenditure to "Shipping expense"; it paid for toys, charging the expenditure to "Office expense"; it paid for gardening services and work done by tree surgeons at petitioner's residence, charging such expenditures to "Sales promotion" and "Office expense", respectively; it paid for nursery equipment for petitioner's children shipped to petitioner's residence, charging such expenditure as a "Purchase of cloth". The foregoing are only samples of a widespread practice of using Bristol to pay personal expenses of petitioner. We are completely satisfied on the record that such payments were not accidental, that petitioner was fully aware that funds of Bristol were bing used for his benefit, and that he knowingly and wilfully omitted them from his income tax returns. The evidence of fraud is overwhelming. Not only do we think that the Commissioner has carried his burden of proving fraud, but it *250 is difficult for us to see how we could make any finding on this record other than the one that part of the deficiency was due to fraud with intent to evade tax. Decision will be entered under Rule 50. Footnotes
1. As to certain cash items, specifically dealt with hereinafter, petitioner contends that he never received the payments in question.↩
2. The figures shown in paragraph 5 of the stipulation are in the aggregate amount of $1,508.06. However, there is an obvious error in items 44-54 shown as $26.40, which should be $28.80. After adjustment for this error, the aggregate amount of the item in paragraph 5 becomes $1,510.46.↩
3. The figures on petitioner's Exhibit 27 with respect to this category show a total of $967.52. However, there appear to be two minor errors on that exhibit, one with respect to item 159 and the other with respect to item 163, which account for the difference.↩
4. Exhibit 27 shows the total to be $438.64. However, errors in items 156 and 304-308 require adjustment of that total to $480.14.↩
5. Exhibit 27 reflects a somewhat different total for the New York bills, as a result of errors in items 187 and 299.↩
6. Exhibit 27 shows the total as $1,237.79. However, there appears to be an error in addition as well as errors in several items recorded on the exhibit. After making adjustments for these errors, we find the correct total to be $1,234.54.↩
7. There is no issue before us as to any of the other four alleged partners.↩